HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| VERDANT HEALTH COMMISSION, et al, <br><br> Plaintiff, <br><br> v. <br><br> SYLVIA MATHEWS BURWELL, Secretary, United States Department of Health and Human Services, <br><br> Defendant. | CASE NO. C14-5108RBL <br><br> ORDER ON MOTIONS FOR SUMMARY JUDGMENT <br><br> [Dkt. #s 11 & 26] |

The plaintiffs challenge the DHHS Secretary's decision to exclude certain low-income populations from Medicare reimbursement calculations. The Medicare formula includes patient days for individuals "eligible for medical assistance under a state plan approved under subchapter XIX." 42 U.S.C. § 1395ww(d)(5)(vi)(II). (Medicaid eligible patients). Additionally, there is another category of patient population "regarded" as Medicaid eligible: patient days served as part of a demonstration project authorized by Section 1115 of the Social Security Act. 42 U.S.C. § 1315(a).

The first issue presented by this appeal is the proper interpretation of the term "eligible for medical assistance" under an approved State plan. This precise question was answered by the

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 1

Ninth Circuit in *University of Washington Medical Center v. Sebelius*, 634 F.3d 1029 (9th Cir. 2011) ("*UW-I*"). Seventeen of the plaintiffs in that case are plaintiffs in this case. They seek to distinguish or overturn *UW-I* on three bases: (1) this case involves a different time period; (2) *UW-I* was wrongly decided; and (3) there is a split within the Circuit on this question that can only be resolved by an *en banc* Ninth Circuit decision.

Plaintiffs' second argument focuses on the fairness of the distinction between § 1115 demonstration project populations ("regarded as eligible") and other, similarly-situated needy patients (not "regarded as eligible"). *UW-I* does not address this second argument, and the plaintiffs did not raise it to the Administrative Court below.

The resolution of the parties' competing summary judgment motions is little more than a hitching post to rest the horses for another assault on the Ninth Circuit. This Court's contribution (for lack of a better term) is to recount the history of legislative, regulatory and judicial pronouncements on these subjects, and to try and predict the final outcome. For the reasons outlined below, the Defendant's Motion for Summary Judgment [Dkt. #26] is **GRANTED**, and the Plaintiffs' Motion for Summary Judgment [Dkt. # 11] is **DENIED**.

## BACKGROUND

**A.   Medicare and Medicaid:  Legislative and Regulatory Pronouncements**

Medicare is a health insurance program that pays for covered medical care primarily to aged and disabled persons. 42 U.S.C. § 1395, *et seq*. Medicaid is a cooperative federal-state program that provides health care to indigent persons who are aged, blind, disabled, or members of families with dependent children. 42 U.S.C. §§ 1396, *et seq*. Medicaid is financed jointly by the federal and state governments, and is administered by the states according to federal guidelines. *Id*.; 42 C.F.R. § 430.0. Each state participating in the Medicaid program must submit to the Secretary a state plan meeting Medicaid's statutory and regulatory requirements.

42 U.S.C. § 1395a.  The state's plan must obtain the Secretary's approval in order for the state to participate in Medicaid.  States have discretion to determine the type and range of services covered, rules of eligibility, and payment levels for services.  42 C.F.R. § 430.0.  Accordingly, Medicaid programs vary from state to state, both with respect to persons and services covered, and to the scope and duration of benefits.  *Legacy Emmanuel Hospital and Health Center v. Shalala,* 97 F.3d 1261 (9th Cir. 1996).

Prior to 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis.  42 U.S.C. § 1395f(b).  Since 1983, Medicare has reimbursed hospitals' operating costs prospectively, under the the Prospective Payment System (PPS).  Payments are based upon what it would cost an efficient hospital to treat a patient with a given diagnosis.  *See* the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), *codified at* 42 U.S.C. § 1395ww (2006).  Hospitals are paid a fixed amount for each patient based on one of approximately 490 diagnosis-related groups (DRG), subject to certain payment adjustments.  42 U.S.C. § 1395ww(d)(1)-(d)(4); 42 C.F.R. Part 412.

In 1983, Congress determined that hospitals that served a disproportionately large number of low-income patients incurred costs that were not met by the standard PPS calculation.  Accordingly, Congress authorized the Secretary to provide an adjustment—the "Disproportionate Share Hospital" Adjustment (DSH)—to hospitals serving a disproportionate share of low-income persons.  42 U.S.C. § 1395ww(d)(5)(F)(i)(I). A designated fiscal intermediary (usually an insurance company) calculates these DSH payments on the basis of the hospitals' "disproportionate share percentage." *Id.* §1395ww(d)(5)(F)(vi).  In part, this calculation requires the fiscal intermediary to determine the proportion of low-income patient

days in the Medicare population the hospital served, a proportion known as the Medicaid fraction, or Medicaid proxy. *Id*. §1395ww(d)(5)(F)(vi)(II).[1]

In 1986, Congress enacted the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). COBRA included a provision creating and defining DSH adjustments. Congress directed the Secretary to provide a DSH adjustment to PPS payments for hospitals serving a disproportionately large number of low-income patients and prescribed a specific adjustment method.

Until 1998, the Secretary included in the Medicaid fraction all patient days during which a patient was entitled to Medicaid, but interpreted the rule to *exclude* days of patients who were Medicaid eligible, but for which the state did not actually make payments (for example, where the state capped the number of patient days). In 1998, following adverse court rulings (including *Legacy Emanuel*), the Secretary amended this rule to provide for computation of DSH reimbursements on the basis of patients' eligibility for Medicaid assistance, regardless of actual payment. 42 C.F.R. § 412.106 (b)(4)(i).

In 2000, the Secretary expanded DSH reimbursement to experimental or "demonstration projects," in which the Secretary waives compliance with the general federal requirements for Medicaid state plans set out in § 1396a. Section 1115 of the Social Security Act authorizes the Secretary to approve such projects to encourage states to adopt innovative programs that are likely to assist in promoting the objectives of Medicaid and other social programs. 42 U.S.C. §

---

[1] This is a fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were *eligible for medical assistance* under a State plan approved under [title] XIX (that is, Medicaid), but who were not entitled to benefits under part A of [Medicare], and the denominator of which is the total number of the hospital's patient days for such period. §1395ww(d)(5)(F)(vi)(II). (Emphasis added.)

1315(a).  The "costs of such projects . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State [Medicaid] plan."  *Id*.  § 1315(a)(2).  Experimental projects may provide medical assistance to individuals who could be eligible for Medicaid even without a waiver, as well as to individuals who would not be eligible.  The latter group, who become eligible for services paid for with Medicaid funds by reason of the Secretary's waiver of particular requirements under § 1115, are known as "expansion populations" or "expanded eligibility populations."  Interim Final Rule, Medicare Program; Medicare Inpatient Disproportionate Share Hospital (DSH) Adjustment Calculation, 65 Fed. Reg. 3136, 3136-37 (Jan. 20, 2000).

Thus, the Medicaid numerator clearly includes those who are "eligible for Medicaid" and those who are "regarded" as eligible because they are treated under an approved § 1115 demonstration project.

The plaintiff hospitals argue that the numerator should also include patient days for those who are not in one of these categories, but who are in every other respect functionally identical to those treated under a §1115 demonstration project.  The Secretary rejected this argument.

**B. Medicaid Low-Income Patients:  Court Decisions**

The Court's review of an agency's interpretation of a statute  is governed by the Supreme Court's two-pronged *Chevron* test:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the *precise question at issue*.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress had not directly addressed the *precise question at issue*, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is

> silent or ambiguous with respect to the *specific issue*, the question for a court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-843 (1984) (emphasis added). The statutory (and regulatory) language at issue here is dense. The interpretation given by the courts over time impacts countless hospitals, involving millions and millions of dollars in claimed reimbursements for medical services to low-income people. Over the years, the respective positions of the hospitals, the Secretary, and their lawyers, have shifted. While the words of the statute in question remain the same, the interpretation given those words by various Courts of Appeal presents an ever-moving target.

The phrase Congress chose to define the Medicaid proxy in its reimbursement calculation is the source of the dispute:

> [T]he number of the hospitals' patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under Title XIX.

42 U.S.C. 1395ww(d)(5)(F)(vi)(II).

In *Legacy Emanuel Hospital and Health Center v. Shalala*, 97 F.3d 1261 (9th Cir. 1996), the Ninth Circuit faced the question of whether hospitals should be reimbursed from DSH adjustment funds for low-income patient care days beyond the cap imposed by the state (in that case, Oregon). The trial court overturned the Secretary's interpretation of a Medicare reimbursement provision, deciding that in clear, unambiguous language, Congress intended to count all days spent in hospitals by low-income patients, whether or not paid by Medicare. The district court relied on the Sixth Circuit's reasoning in *Jewish Hospital, Inc., v. Secretary of Health and Human Servs.*, 19 F.3d 270 (6th Cir. 1994). The Oregon district court determined that the issue before it was identical to the issue before the Sixth Circuit. In *Jewish Hospital*,

however, the government had conceded that the term "for such days" was ambiguous. But in *Legacy Emanuel*, the government argued that the term "for such days" was *un*ambiguous, and that the plain language of the statute supported the Secretary's interpretation. The Ninth Circuit affirmed, concluding the language "for such days" was unambiguous.

In *Portland Adventist Medical Center v. Thompson*, 399 F.3d 1091 (2005), the Ninth Circuit addressed a wrinkle in the eligibility requirements, introduced by the Secretary's waiver of a § 1115 demonstration project. When the Secretary approves a §1115 demonstration project, he waives compliance with § 1396a's general requirements for Medicaid state plans. "The costs of such project[s] . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State [Medicaid] plan." 42 U.S.C. § 1315(a)(2). The issue was whether the expansion population covered in the § 1115 demonstration project was "eligible" for Title XIX matching payments, even though they were not, by definition, "eligible for Medicaid."

The Secretary argued the term "eligible for medical assistance under a State plan" was at least ambiguous, entitling his interpretation to deference. He argued that § 1115 patients who receive assistance only because he has waived their compliance with the Act's general requirements may be regarded as *not* "eligible for medical assistance under a State plan." 42 U.S.C. § 1315(a)(2)(A). The trial court and the Ninth Circuit determined the language clear and unambiguous, and held the § 1115 population was properly included in the Medicaid numerator.

The final sentence of the Ninth Circuit's affirming opinion, however, was quite broad: "the text of the statute, the intent of Congress, and the decisions of this and other courts make it plain that the *entire low-income population* actually served by the hospitals—including § 1115 expansion populations—must be accounted for in the DSH Medicaid fraction." *Id*. at 1099.

1    It is now well-established the Medicaid numerator calculation should include the
2 Medicaid eligible population, and the § 1115 population.  But subsequent opinions clearly
3 curtailed the Ninth Circuit's holding that *all* low income populations should be counted for
4 reimbursement purposes.

5    In 2008, the D.C. Circuit construed the language "eligible for medical assistance" under
6 Ohio's approved State Medicaid plan.  It determined that the language was clear and
7 unambiguous under the first prong of its *Chevron* analysis.  Because Ohio's program was wholly
8 supported by State and county funds—not federal funds—the patients (and by extension, the
9 hospitals who serve them), are not eligible for DSH funds, and those patient days are not
10 included in the Medicaid fraction for ultimate reimbursement.  *Adena Regional Medical Center*
11 *v. Leavett*, 527 F.3d 176 (D.C. Cir. 2008).

12    In 2010, the Ninth Circuit addressed a similar issue.  In *Phoenix Memorial Hospital v.*
13 *Sebelius*, 622 F.3d 1219 (9th Cir. 2010), eight Arizona hospitals sought higher DSH adjustments,
14 claiming that all low income patients should be included in the Medicaid numerator.  The
15 component parts of the State plan were the Medically Needy ("MN") and the Medically Indigent
16 ("MI") populations that were wholly supported by State funds.  The district court dismissed the
17 claim on summary judgment.  The Ninth Circuit applied the second prong of *Chevron* and
18 affirmed.  Based upon the evidence that the MN and MI populations were not eligible for
19 medical assistance under Medicaid, and they were not part of a § 1115 demonstration project
20 approved by the Secretary, it held that they fell outside the approved criteria for DSH
21 reimbursement.

22    Finally, in 2011, the Ninth Circuit addressed the very Washington health care programs
23 that are the subject of this case.  *University of Washington Medical Center v. Sebelius*, 634 F.3d
24

1029 (9th Cir. 2011). Washington State's Department of Social and Health Services (DSHS) divides the subsidized patient population into four categories: (1) Categorically Needy, (2) Medically Needy, (3) General Assistance-Unemployable (GAU), and (4) Medically Indigent (MI). The categorically needy and the medically needy are by definition "eligible for Medicaid assistance." In *UW-I*, the hospitals admitted that the two remaining groups, GAU and MI, were not eligible for traditional Medicaid, because they were not aged, blind or disabled, and they do not have dependent children. 42 U.S.C. § 1396-1.

Moreover, the GAU and the MI are not "regarded as eligible" as part of an approved § 1115 demonstration project. Nevertheless, the hospitals pointed out that, since 1991, Washington has been using other federal Medicaid-allotted funds to defray the State's cost for covering these individuals. They argued that Medicaid dollars have long subsidized the care provided to these individuals, and therefore that they should be considered "Medicaid patients" for purposes of calculating the hospitals' Medicare DSH reimbursements. In effect, the *UW-I* plaintiff hospitals sought to open a third portal under which to treat or "regard" a patient as Medicaid eligible, and thus obtain additional reimbursements, even though the patient is not Medicaid eligible or part of a §1115 demonstration project.

The Ninth Circuit focused on the now-familiar language "eligible for medical assistance" under an approved State Medicaid plan. It determined that this language was clear and unambiguous. It held that "medical assistance" is limited to those eligible for traditional Medicaid. Although Medicare does not define "medical assistance," the Court looked to the Medicaid definition of "medical assistance" because it is the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932). Indeed, given that the Medicare

1   DSH adjustment counts patients who are eligible for "medical assistance" under subchapter XIX,
2   it is hard to imagine looking anywhere other than subchapter XIX for a definition of this critical
3   term.  *Cf.  Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1226 (9th Cir. 2010).

4   Under Medicaid, "medical assistance" does not include just "any type of medical
5   assistance under a state plan." *Id*. at 1225; *accord Adena Reg'l Med. Ctr. V. Leavitt*, 527 F.3d
6   176, 179-80 (D.C. Cir. 2008); *Cooper Univ. Hosp. v. Sebelius*, 686 F.Supp.2d 483, 494 (D.N.J.
7   2009) *aff'd* 636 F.3d 44 (3rd Cir. 2010).  Rather, "medical assistance" is a statutory term of art
8   that "means payment of part or all of the cost of [certain enumerated categories of] care and
9   services . . . for individuals, and, with respect to physicians' or dentists' services, at the option of
10  the State, to individuals" who meet statutory eligibility criteria.  42 U.S.C. § 1396d(a); *Phoenix
11  Mem'l Hosp.*, 622 at 1226.

12  Thus, the definition of "medical assistance" has four key elements:  (1) federal funds; (2)
13  to be spent in "payment of part or all of the cost"; (3) of certain services; (4) for or to "patients
14  meeting the statutory requirements for Medicaid."  *UW-I* at 1034.

15  Even though federal Medicaid money indirectly subsidized the medical treatment
16  received by Washington's GAU and MI populations, their care still does not meet this definition
17  of "medical assistance."

18  The Ninth Circuit concluded that the GAU and the MI populations are similar, but
19  sufficiently distinct from the categorically needy and the medically needy, which are populations
20  that are traditionally eligible for Medicaid.  When the State used Medicaid money allocated by
21  the federal government it was not tantamount to the federal government intentionally spending
22  its funds for the GAU and MI populations, as opposed to other low-income people whom the
23  State wants to subsidize.  Finally, the State-specific allotment from the federal government
24

grows by inflation, and not because of the expansion of the needs of the patients or the receiving hospitals. The Ninth Circuit determined that these differences justified treating the populations differently for purposes of calculating the Medicaid numerator. GAU and MI populations are not part of a § 1115 demonstration project, and they do not meet the eligibility requirements of traditional Medicaid patients. Therefore, they are to be excluded from the calculation of reimbursement amounts allocated directly and specifically for eligible patients.

*UW-I*'s result and reasoning are persuasive. Neither Congress nor the Secretary has approved a third method for hospitals to tap into the DSH funds for additional reimbursements. Nowhere has Congress or the DHHS delegated to the States the authority to unilaterally change or expand the eligibility requirements prescribed for DSH Adjustments. The only populations eligible for subsidies from the DSH fund are Medicaid eligible patients, and those who are "regarded as eligible" because they participate in § 1115 demonstration projects.

*UW-I*'s result is also binding Ninth Circuit precedent, and it resolves this case. *UW-I* does not conflict with *Portland Adventist* or *Phoenix Memorial*. These cases are in a continuum of decisions that construe the unambiguous statutory language within a distinct factual context. The takeaway from the three decisions is that traditional Medicaid patients and § 1115 populations are the only populations that are qualified for the calculation of DSH reimbursement payments. Since *Adena*, no court has expanded the definition of qualified populations, nor posited a theory for supporting expansion by state action or by judicial fiat.

Furthermore, seventeen of the 26 plaintiff hospitals participated in *UW-I*. They are estopped from re-litigating the same issues litigated in *UW-I*. The elements of collateral estoppel are: 1) the estopped issue is identical to an issue litigated in a previous action and 2) the issue to be foreclosed in the second litigation must have been litigated and decided in the first case.

*Kamilebe, Co. v. United States,* 53 F.3d 1059, 1062 (9th Cir. 1995).  The bulk of the plaintiffs seek to re-litigate the precise "eligibility" question   already considered and decided in *UW-I* , and they are barred from doing so.  The new plaintiffs' claim fails because this Court is bound by *UW-I.*

The Plaintiffs' motion for summary judgment on this issue is DENIED, and the Defendant's motion for summary judgment is GRANTED.

**C. Equal Protection/Arbitrariness.**

Plaintiffs' second, new argument is that the Secretary's interpretation of the Medicare DSH statute to *include* Section 1115 patient days, while *excluding* MI and GAU patient days, is arbitrary and capricious and violates the plaintiffs' rights under the Equal Protection Clause of the U.S. Constitution.

The arbitrary and capricious test is derived from the Administrative Procedure Act (APA).  5 U.S.C. § 706(2)(A)&(D).  "Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently,  If [an] agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013).  Review of an equal protection claim in the context of agency action is similar to that under the APA.  An agency's decision must be upheld if it can show a "rational basis" for its decision.  *F.C.C. v. Beach Communications Inc.*, 508 U.S. 307, 313 (1993).

Plaintiffs' equal protection argument can be blended into the APA argument, because there is no suspect class and the only question is whether the Secretary's treatment of the hospitals was rational (i.e., not arbitrary and capricious).  *Ursack Inc. v. Sierra Interagency Black Bean Group*, 639 F.3d 949, 955 (9th Cir. 2011).  The issue is simply whether the Secretary set forth a satisfactory, rational explanation for her actions here.

The plaintiffs' APA/Equal Protection ("fairness") argument was not properly raised and therefore not considered during the administrative appeals process. The Administrator upheld the Board's determination that it could not consider these arguments because plaintiffs failed to comply with Board Rules 32.3(C) and 44 when they filed supplemental position papers raising these new arguments. AR 24 n.48.

The APA/Equal Protection argument was not just omitted from the Administrative hearing process in this case, but it was also absent from consideration in *UW-I*. This Court could deny the "fairness" claims on procedural grounds. Or, it could remand to the administrative court to conduct further hearings and resolve these issues based upon a complete record. The Court chooses to deal with the question on the merits, with the knowledge of a fully developed record in an identical Pennsylvania case, culminating in a thorough opinion by the Third Circuit. *Nazareth Hospital v. Secretary*, 747 F.3d 172 (3rd Cir. 2014). The question presented here is not novel and will be dispatched without further delay on the parties' way to the Ninth Circuit.

In *Nazareth Hospital,* Pennsylvania and the plaintiff hospitals faced the same issue with Pennsylvania's General Assistance (GA) Program as the plaintiffs face here with the MI and GAU patients. Section 1115 waiver patient days were included in Medicare DSH calculations, while GA patient days were excluded. The Pennsylvania legislature authorized Medicare grant money to be used for GA patients in addition to (and not a substitute for) disproportional share funds allocated by the federal government on behalf of eligible Medicare patients. The Pennsylvania legislature mimicked similar actions in other states, including Washington.

In *Nazareth Hospital,* the trial court granted summary judgment for Plaintiff hospitals. On appeal, the Third Circuit reversed in a comprehensive, if not altogether persuasive,

explanation for the difference between qualified programs (Medicaid eligible patients and 1115 programs) and those unqualified to receive reimbursement for patient days in hospital.

The Third Circuit focused on the language of the enabling statute, 42 U.S.C. § 1385ww (d)(5)(F)(vi)(II).  While the statutory language does not determine whether the Secretary acted in an arbitrary and capricious manner, it is evidence that the distinction was intentional and purposeful.  In 2005, Congress legislatively ratified the Secretary's 2000 Interim Final Rule.  Thus, there can be no dispute that the Secretary had the authority and the discretion to include § 1115 patient days in the Medicare DSH adjustment and, by implication, authority and discretion to *exclude* patient days from programs *not* approved and controlled by the federal government.

The Third Circuit next assessed the purpose of the different treatment between §1115 demonstration programs and similar programs that do not so qualify.  A § 1115 demonstration project is fully vetted and approved by the Secretary as one likely to advance the objectives of Medicaid.  The Pennsylvania GA plan required no federal judgment that its program was likely to assist in promoting the goals of Medicaid.  In contrast, the Secretary reviewed the state's GA program simply to ascertain how Pennsylvania intended to disburse Medicaid DSH payments.

Another difference between § 1115 projects and other state programs is the extent of federal control.  The Secretary has significant authority over the scope of the § 1115 projects, the degree to which certain Medicaid requirements will be waived, how long the waiver will last, and whether the costs of the projects will be considered Medicaid expense eligible for matching payments under the statute 42 U.S.C. § 1315(a)(1) – (a)(2).  The Secretary has no authority over the operations of the state GA program.  "Control" is a factor of considerable importance in the Secretary's explanation of the distinction.  The stewardship of federal tax monies is a rational reason for the distinction between § 1115 and GA programs.

Finally, the Third Circuit responded to the plaintiff hospitals' argument, that the providers (hospitals) and the consumers (low-income patients) of § 1115 projects and state GA programs are virtually indistinguishable and therefore they should be treated as the same for purpose of reimbursement from the Medicare DSH fund.

It concluded that even if the claimed similarities exist, they are irrelevant: "While people and services may be the same, they can be treated differently for purposes of reimbursement if the reason for the differing treatment is rational." *Nazareth Hospital*, *id* at 184. The successful argument was that any funding of GA services with federal dollars taken from allocated, lump sum funds was purely Pennsylvania's choice, and that cannot convert the GA programs—a creature of state law—into one of federal law, *Nazareth Hospital*, *id* at 184 n.7, *citing UW-I* 634 F.3d 1029, 1035 (9th Cir. 2005). The purpose of § 1115 waiver projects and their accompanying conditions under federal control, reasonably distinguish such projects from Pennsylvania's GA program, and were set forth as rational bases for different treatment by the Secretary.

In this case, the Court confronts the same situation that the Third Circuit addressed in *Nazareth*:

    (a) A low income population in need of medical care;

    (b) Hospitals who serve a disproportionate number of needy people; and

    (c) A state which chose to divert monies previously allocated by the federal government in lump sum and re-allocated by the State to help finance a "state only" program.

The difference between the demonstration projects and the "state only" program are slight. But the rational basis bar is low. The extent of federal control over the § 1115 demonstration projects presents a satisfactory reason to justify the allocation of federal taxpayer monies to reimburse eligible or "regarded" as eligible patients while excluding similarly situated

patients who are not in such a program. The Secretary provides a rational basis for the decision to exclude "state only" programs like MI and GAU programs, while including § 1115 projects.

The Plaintiffs' Motion for Summary Judgment on this issue is **DENIED**. The Defendants' Motion is **GRANTED**.

## CONCLUSION

1. The statutory language "eligible for medical assistance under a State plan approved under subchapter XIX" is clear and unambiguous.

2. The MI and GAU programs are not comprised of Medicaid eligible patients and the hospitals who serve them are not qualified for reimbursement from DSH funds for those program patients.

3. The Secretary has proffered a satisfactory and rational reason for differentiating the § 1115 demonstration projects from other programs like MI and GAU that are not "regarded" as Medicaid eligible.

Plaintiff's Motion for Summary Judgment [Dkt. #11] is **DENIED** and Defendant's Motion for Summary Judgment [Dkt. #26] is **GRANTED.**

**IT IS SO ORDERED.**

Dated this 1st day of September, 2015.

Ronald B. Leighton
United States District Judge